IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

REECE ARNOLD,

                    Plaintiff,

        v.

CNH INDUSTRIAL AMERICA, LLC,

                    Defendant.

Case No. 21-2341-DDC

## MEMORANDUM AND ORDER

This is a product liability case involving a round baler designed and manufactured by defendant CNH Industrial America, LLC.  The Baler, owned by plaintiff Reece Arnold, caught fire, destroying itself and a tractor, and this lawsuit followed.  Plaintiff's experts blamed the fire on a failed driveshaft bearing.  Defendant's expert agreed, but he explained *why* the bearing failed:  an improper repair made by plaintiff, improper maintenance, and failure to follow the relevant manuals.  Defendant's expert noted specifically that plaintiff had repaired the Baler improperly by welding a fence post to the Baler's wind guard.  Plaintiff's experts never addressed the wind guard repair or explained why the Baler's bearing failed.

Defendant filed a Motion for Summary Judgment (Doc. 63), arguing that plaintiff cannot prove proximate cause as a matter of law because the unchallenged evidence established that plaintiff's wind guard repair caused the bearing to fail.  Defendant also filed a Motion to Strike (Doc. 66) part of a supplemental affidavit submitted by plaintiff's expert.  As explained below, the court grants both motions.

I.        Background

Plaintiff Reece Arnold is a farmer in Cassoday, Kansas.  Doc. 62 at 2 (Pretrial Order ¶ 2.a.v.).  On September 28, 2018, plaintiff purchased a new 2017 New Holland Round Baler

560 from KanEquip, Inc.  *Id.* (Pretrial Order ¶ 2.a.vii.).  Defendant CNH designed and

manufactured, in part, the Baler.  *Id.* (Pretrial Order ¶ 2.a.viii.).

### The Express Warranty & Operator's Manual

The Baler came with a one-year limited Express Warranty that covered specified repairs,

subject to exclusions.  *Id.* at 2–3 (Pretrial Order ¶ 2.a.ix.).  The Express Warranty covers

"defect[s] in material or workmanship . . . found in a unit and reported during the Warranty

Period[.]"  Doc. 64-1 at 133 (Express Warranty).  Plaintiff signed the Express Warranty when he

purchased the Baler.  Doc. 62 at 2–3 (Pretrial Order ¶ 2.a.ix.).  So, the Express Warranty expired

on September 27, 2019.  *Id.*

The Express Warranty provided, "Genuine NHAG[1] service parts or NHAG approved

service parts that meet NHAG specifications must be used for maintenance and repair."  *Id.* at 3

(Pretrial Order ¶ 2.a.xi.); Doc. 64-1 at 133 (Express Warranty).  The Express Warranty also

didn't cover "repairs arising from any unauthorized modification to the product or the use of

non-NHAG parts[.]"  Doc. 62 at 3 (Pretrial Order ¶ 2.a.xii.); Doc. 64-1 at 133 (Express

Warranty).  The Baler's dealer, KanEquip, performed warranty service work on the Baler on

multiple occasions:  a few times before the wind guard repair and once after the wind guard

repair.  Doc. 62 at 3 (Pretrial Order ¶ 2.a.xv.).

According to the Express Warranty, it was the Baler owner's responsibility to "perform[]

the required maintenance at the recommended intervals outlined in the product operator's

manual[.]"  Doc. 64-1 at 133 (Express Warranty).  When plaintiff bought the Baler, he received

the Baler's Operator's Manual.  Doc. 62 at 3 (Pretrial Order ¶ 2.a.xvii.).  Plaintiff never read the

Manual.  *Id.* (Pretrial Order ¶ 2.a.xviii.).

---

[1]     The summary judgment record suggests that this acronym, NHAG, also refers to defendant CNH.

The Express Warranty explicitly excluded coverage of "[r]epairs arising from . . . failure to maintain the equipment, negligence, alteration, [or] improper use of the equipment[.]"  Doc. 64-1 at 133 (Express Warranty).

### *Baler's Wind Guard Breaks, Plaintiff Repairs*

Plaintiff's Baler had a wind guard:  a bar sitting in front of the mechanism that picks up the hay.  Doc. 64-1 at 11 (Pl. Dep.)[2].  The wind guard hits the hay and flattens out the windrow.[3]  *Id.*  In May or June 2019, the Baler's wind guard broke.  *Id.* at 11, 13 (Pl. Dep.).  Some heavy brome hay had plugged up the Baler, and it had cracked.  *Id.* at 14 (Pl. Dep.).  Plaintiff, in a hurry because of impending rain, tack welded a fence post to the wind guard.  *Id.* at 11; Doc. 62 at 3 (Pretrial Order ¶ 2.a.xiii.).  Plaintiff described his repair this way—"I farmer fixed it, so to speak."  Doc. 64-1 at 14 (Pl. Dep.).

The fence post wasn't an NHAG service part or NHAG-approved service part and didn't meet the NHAG specifications for maintenance and repair.  Doc. 62 at 3 (Pretrial Order ¶ 2.a.xiv.); Doc. 64-1 at 15 (Pl. Dep.).  Defendant didn't authorize plaintiff's modification of the Baler.  Doc. 62 at 3 (Pretrial Order ¶ 2.a.xvi.); Doc. 64-1 at 15 (Pl. Dep.).  And plaintiff knew he wasn't using an authorized part.  Doc. 64-1 at 15 (Pl. Dep).

Plaintiff testified that he didn't notice any problems with the Baler after he fixed the wind guard with the fence post.  Doc. 65-2 at 8 (Pl. Dep. 83:3–13).  Plaintiff's associate, Caleb Allenmand, testified that the wind guard repair "did not affect the operation of the baler in any way, shape or form."  *Id.* at 12–13 (Allenmand Dep. 17:17–18:1).  Allenmand testified that the

---

[2]      The court notes that defendant's attached deposition exhibits don't include page numbers, so the court cannot provide pin cites to the relevant portions of the depositions.

[3]      A windrow is a row of cut hay.

fence post "was not in any moving parts" because it "was welded to the front, so it was not going to affect anything else[.]" *Id.* at 13 (Allenmand Dep. 18:9–19).

As mentioned above, KanEquip, the Baler's dealer, made repairs to the Baler four times, including once after plaintiff had repaired the wind guard. When a KanEquip employee came out the last time, Allenmand mentioned the wind guard fix to the employee and "pointed out to him exactly what was happening." *Id.* at 12 (Allenmand Dep. 15:3–17:7). No KanEquip employee ever told plaintiff that he was abusing the Baler, misusing the Baler, or using the Baler in a way that would void the Baler's warranty. *Id.* at 9 (Pl. Dep. 86:20–87:7).

### *Baler Fire*

On August 8, 2019, plaintiff baled hay, pulling the Baler with a John Deere tractor. Doc. 62 at 4 (Pretrial Order ¶ 2.a.xix.). While plaintiff was baling, the Baler caught on fire. *Id.* Plaintiff used a fire extinguisher to try to put the fire out, but he didn't succeed. *Id.* (Pretrial Order ¶ 2.a.xx.). The Baler and the John Deere tractor pulling it were total losses. *Id.* at 4 (Pretrial Order ¶ 2.a.xxi.).

Plaintiff reported the Baler fire to his insurer the next morning. Doc. 64-1 at 8–9 (Pl. Dep.). Plaintiff didn't report the fire to the Baler's dealer, KanEquip. *Id.* at 10 (Pl. Dep.). Plaintiff also didn't report the fire to defendant. *Id.* Defendant learned about the fire on January 27, 2020, when it received a litigation notice letter. *See id.* at 139 (Notice of Claim). The letter didn't mention the Express Warranty or request a warranty repair. *See id.* at 139–40 (Notice of Claim).

### *Plaintiff's Experts*

Plaintiff has proffered the testimony of two experts: Kenneth R. Scurto and Steven R. Hamers. *Id.* at 128 (Pl.'s Expert Disclosures). Scurto's expert opinion provides: "Evidence indicates that the bearing at the outside end of the drive shaft failed which resulted in severe

wear on the shaft to the point where it twisted apart." *Id.* at 66 (Scurto Report).  Scurto concluded that "the cause of the fire has been determined to be the ignition of combustible materials by heat produced through friction from the metal on metal contact that occurred as the bearing failed." *Id.*  Scurto didn't opine about the cause of the failed bearing.

Hamers concluded that the "fire was caused [by] heat production from a failed bearing." *Id.* at 99 (Hamers Report).  Hamers also opined that the "failed bearing does require periodic lubrication which [plaintiff] indicated that he does on a routine basis." *Id.*  Hamers didn't opine about the cause of the failed bearing.

In sum, plaintiff's experts concluded that a failed driveshaft bearing caused the fire. Plaintiff also has proffered evidence that 10% of PEER-brand agricultural bearings do not reach their life expectancy.  Doc. 65-2 at 70 (PEER Brochure).  Neither of plaintiff's experts mention PEER bearings or PEER bearings' failure rate.

### *Defendant's Expert*

Defendant's expert, Bob Hawken, agrees that a failed bearing caused the fire, but he has more to say.  Hawken's report recounts the four warranty repairs that KanEquip made on the Baler and opines that the "warranty repairs reflect abuse and misuse of the baler that would stress the entire drive system, including the suspect bearing."  Doc. 64-1 at 22 (Hawken Report). Hawken's report also reports that there was "physical evidence that something other than hay went through this baler which resulted in damage to the rollers on the sledge."  *Id.*

Critically, for summary judgment purposes, Hawken's report mentions plaintiff's wind guard repair.  His report explains:

> There is . . . evidence the wind guard tube and wind guard roller, both of which help transition and feed hay and material onto the baler pickup, was damaged prior to the fire.  Someone welded a steel fence post along a vast length of the tube, which interfered with the wind guard roller. . . . This tube is available through [defendant's] parts network and should have been replaced rather than welding a

piece of steel fence post onto the tube[.] . . . This modification also has wider implications and consequences:  the sledge rollers showed signs of physical damage from ingestion of foreign objects (material other than hay) that caused the subsequent damage and deterioration to the PTO output shaft, bearing, and other damage to rollers, belts, and chains.

There is physical post-fire evidence that this baler was not well maintained or serviced properly.  Recommendations are clearly explained in the Operator's Manual:  following and completing these recommendations and tasks are the sole and direct responsibility of the owner / operator.

Repairs made to / on this baler were not in accordance with proper service or maintenance recommendations found in the Operator's or Service Manuals.

Proper feeding of hay material onto the baler pickup is a necessity particularly since a non-functioning component can cause improper feeding and balling up of material before getting into the pickup, leading to improper bale formation and other problems.  The wind guard components are designed and installed to improve and help material feed properly for proper bale formation.  Using a steel fence post with sharp edges which interfere[s] with and prevents the wind guard roller from turning is an improper and unauthorized repair.

Authorized replacement parts were and are available to make proper repairs.  The tube repair / replacement should have been made using the correct parts, but that was not done.  Instead, a fence post was utilized.

. . . .

There is only one avenue of material ingress into the baler, and it is past these [wind guard] components.  If an object is large enough to damage internal rollers and possibly even stall an operational baler while in use (while the PTO is engaged) it's likely to put stress on the PTO output shaft and all other driven components downstream which includes rotating shafts, rollers, bearings, idlers, sprockets, and chains.

*Id.* at 22–23 (Hawken Report).  In sum, Hawken's report opines,

the cause of this fire, even if identified as a damaged bearing, was the direct result of improper repairs/modifications (including the welding of a steel fence post to the wind guard tube), improper maintenance, and a failure to follow recommended practices and instructions found with the Operator's and Service Manuals.

*Id.* at 23 (Hawken Report).

## II.        Motion to Strike

Before the court engages in a summary judgment analysis, it must address defendant's Motion to Strike (Doc. 66).  As mentioned above, Hamers, one of plaintiff's experts, concluded in his expert report that the "fire was caused [by] heat production from a failed bearing" and the "failed bearing does require periodic lubrication which [plaintiff] indicated that he does on a routine basis."  Doc. 64-1 at 99 (Hamers Report).  Hamers's expert report didn't opine about the cause of the bearing failure.  But, with plaintiff's summary judgment response, Hamers submitted a supplemental affidavit.  It provides, "As Reece Arnold, Caleb Allenmand, and Jack Donner—the individuals familiar with the Subject Baler—testified, the baler repair utilizing a fence post did not adversely affect the operation of the Subject Baler and could not have caused the failure of the driveshaft bearing."  Doc. 65-2 at 16 (Hamers Aff. ¶ 6).  Defendant argues that the court should strike this paragraph of Hamers's supplemental affidavit under Fed. R. Civ. P. 37(c)(1) as untimely under Fed. R. Civ. P. 26.  The court thus recites the legal standards governing expert disclosures, next.

### A.        Legal Standard

Rule 26(a)(2)(B)(i) requires that the parties' expert witnesses provide a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them[.]"  Rule 26(a)(2)(D) requires the parties to disclose their expert reports "at the times and in the sequence that the court orders."  And Rule 26(e)(1) imposes an ongoing duty for parties to supplement or correct an expert report if the expert report "is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"  But Rule 26(e)(1) "does not give [the parties] a right to disclose information in an untimely fashion."  *Aid for Women v. Foulston*, No. 03-1353-JTM, 2005 WL 6964192, at *3 (D. Kan. July 14, 2005) (citation omitted).  "A party

may not utilize Rule 26(e)(1) to sandbag his opponent or to deepen or strengthen his case where the information should have been included in the expert report." *Id.* (citation and internal quotation marks omitted).  If a party fails to comply with Rule 26, then Rule 37 applies.

Rule 37(c)(1) provides that if "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless."  A district court has "broad discretion" to determine "whether a Rule 26(a) violation is justified or harmless[.]" *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (citation and internal quotation marks omitted).  To determine whether a party's failure to comply with Rule 26 qualifies as justified or harmless, district courts apply the following four factors:  "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.*

### B.     Analysis

Here, the court's Scheduling Order required plaintiff to serve his expert reports by June 13, 2022.  Doc. 24 at 4.  Defendant's expert deadline was August 15, 2022. *Id.*  And the parties had to submit rebuttal reports by September 19, 2022. *Id.*  Plaintiff timely disclosed the Hamers and Scurto expert reports, and defendant timely disclosed Hawken's expert report.  Plaintiff did not submit any rebuttal to Hawken's expert report.  Discovery closed on January 12, 2023.  Doc. 54.

Recall that Hamers has opined that a failed bearing caused the Baler fire and didn't mention the wind guard repair.  Doc. 64-1 at 99 (Hamers Report).  Hawken agreed with Hamers, but, unlike Hamers, continued his analysis.  Hawken concluded that the failed bearing "was the

direct result of improper repairs/modifications (including the welding of a steel fence post to the wind guard tube), improper maintenance, and a failure to follow recommended practices and instructions found within the Operator's and Service Manuals." *Id.* at 23 (Hawken Report). In the Pretrial Order, defendant included the following defense: "The unrefuted expert testimony, put forth by CNH's expert, Robert Hawken, is that Plaintiff's unauthorized modification to the Subject Baler caused the fire. Plaintiff's experts do not offer any opinions regarding the fence post that was welded to the Subject Baler and the deadline for expert disclosures has passed." Doc. 62 at 17 (Pretrial Order ¶ 4.b.xxi.). Defendant then moved for summary judgment based, in part, on this defense. Doc. 64 at 12–13.

Plaintiff attached Hamers's affidavit in his response to defendant's summary judgment motion. *See* Doc. 65-2 at 15–16 (Hamers Aff.). In paragraph six of Hamers's supplemental affidavit, Hamers provided, "As Reece Arnold, Caleb Allemand, and Jack Donner—the individuals familiar with the Subject Baler—testified, the baler repair utilizing a fence post did not adversely affect the operation of the Subject Baler and could not have caused the failure of the driveshaft bearing." *Id.* at 16 (Hamers Aff. ¶ 6). Defendant seeks to strike this paragraph as an untimely expert opinion.

Plaintiff responds, asserting that Hamers's supplemental affidavit isn't untimely because it's consistent with his expert report. Plaintiff explains that Hamers's expert report ruled out other possible causes of the bearing failure—*i.e.* poor maintenance and oversized bale production. So, plaintiff argues, Hamers merely provided a causation opinion consistent with his earlier causation opinion. That's a stretch, and it's an unwarranted one. Hamers's expert report never mentions the wind guard repair. *See generally* Doc. 64-1 at 94–99 (Hamers Report). And the expert report doesn't mention that Hamers had reviewed testimony from plaintiff,

Allenmand, or Donner.  *See generally id.*  So, defendant is correct—Hamers's supplemental affidavit adds new opinions because it added a previously undisclosed opinion, *i.e.*, the wind guard repair didn't cause the bearing failure.

But even if the court viewed the supplemental affidavit as a consistent supplement to Hamers's expert report—which it doesn't—the court still would find the affidavit improper.  An expert can supplement his report only if he learns the report is incomplete or incorrect.  Fed. R. Civ. P. 26(d).  Restating, clarifying, or bolstering an opinion doesn't fall within these narrow parameters.  *See Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 663 (10th Cir. 2018) ("Highlighting previous testimony is not proper supplementation under Rule 26(e).");  *Richardson v. Korson*, 905 F. Supp. 2d 193, 199 (D.D.C. 2012) ("[Rule 26(e)] does not grant a license to supplement a previously filed expert report because a party wants to." (citation and internal quotation marks omitted));  *S.E.C. v. Nacchio*, No. 05-cv-00480, 2008 WL 4587240, at *3 n.3 (D. Colo. Oct. 15, 2008) ("To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation" (citation and internal quotation marks omitted)).  And plaintiff can't "utilize Rule 26(e)(1) to sandbag his opponent or to deepen or strengthen his case where the information should have been included in the expert report."  *Aid for Women*, 2005 WL 6964192, at *3 (citation and internal quotation marks omitted).  Plaintiff has violated Rule 26, so the court turns to Rule 37 to decide what to do about it.

Rule 37(c)(1) provides that plaintiff can't use Hamers's untimely opinion to oppose summary judgment unless plaintiff's failure to comply with Rule 26 "was substantially justified or is harmless."  Plaintiff does not explain—at least not adequately—his failure to offer Hamers's new opinion that the wind guard repair with the fence post didn't cause the bearing

failure within the deadlines imposed by Rule 26 and the court's scheduling orders. Defendant, for its part, argues that plaintiff's late disclosure has prejudiced it within the meaning of *Woodworker's Supply*, 170 F.3d at 993. Doc. 66 at 4–5. Defendant asserts that allowing Hamers's late opinion would cause it prejudice because discovery has closed, and defendant already has moved for summary judgment based on plaintiff's "failure to disclose any expert opinions on causation." *Id.* at 4. Defendant notes that Hamers had access to the information necessary to form this opinion months ago: defendant served Hawken's expert report in August 2022 and the depositions Hamers's affidavit mentions occurred in December 2022.

The court agrees with defendant. Plaintiff hasn't explained why Hamers didn't include this new opinion about the wind guard repair in his original report. It's too late for that opinion to emerge. To allow such a late opinion would prejudice defendant. And the court can't allow plaintiff to skirt requirements and deadlines imposed by the court and the Federal Rules of Civil Procedure without undermining its duty to process cases and claims efficiently. The court thus grants defendant's "Motion to Strike Paragraph 6 of Affidavit of Steven Hamers" (Doc. 66).

The court now turns its attention next to defendant's Motion for Summary Judgment (Doc. 63). But, first, it recites the legal standard governing summary judgment motions.

## III.        Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth

facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022)

(quotation cleaned up).

Finally, federal courts don't view summary judgment as a "disfavored procedural

shortcut."  *Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure "designed 'to

secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R.

Civ. P. 1).

## IV.      Analysis[4]

Plaintiff asserts three claims:  (1) breach of express and implied warranties; (2) products

liability; and (3) negligence.  Doc. 62 at 12–15 (Pretrial Order ¶ 4.a.).  The Kansas Product

Liability Act applies to these claims.  Kan. Stat. Ann. § 60-3302(c) (defining broadly "Product

liability claim" to include "any action based on[] strict liability in tort, negligence, [and] breach

of express or implied warranty"); *see also Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1227

(D. Kan. 2002) ("The Kansas Product Liability act . . . applies to all product liability claims

regardless of the substantive theory of recovery."); *Savina v. Sterling Drug, Inc.*, 795 P.2d 915,

931 (Kan. 1990) ("[U]nder Kan. Stat. Ann. [§] 60-3302(c), the provisions of the Act apply to

---

[4]      Kansas law governs the claims asserted in this diversity action.  *See* Doc. 62 at 1, 2 (Pretrial
Order ¶ 1.a., 1.d.) (invoking court's diversity subject matter jurisdiction and agreeing—subject to the
court's own conclusion—that Kansas law governs the case).  In a diversity case, like this one, the court
applies the substantive law of the forum state, including its choice of law rules. *Emp'rs Mut. Cas. Co. v.
Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010) (citation omitted).  Kansas courts follow the
rule of *lex loci delicti* for tort claims, applying the substantive law of the place where a tort occurred.
*Anderson v. Com. Constr. Servs., Inc.*, 531 F.3d 1190, 1193–96 (10th Cir. 2008); *Ling v. Jan's Liquors*,
703 P.2d 731, 735 (Kan. 1985).  Here, the torts giving rise to plaintiff's claims occurred in Kansas—*i.e.,*
the place where defendant sold the Baler, where plaintiff purchased the Baler, and where the Baler caught
fire.

actions based on strict liability in tort as well as negligence, [and] breach of express or implied warranty[.]").

To "establish a prima facie case for negligence or strict liability in a Kansas products liability case, plaintiff must produce evidence that shows:

(1) the injury resulted from a condition of the product;

(2) the condition was an unreasonably dangerous one; and

(3) the condition existed at the time it left defendant's control."

*103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006) (citation and internal quotation marks omitted).  Defendant seeks summary judgment here because, in defendant's view, plaintiff cannot create a triable issue on element one—causation.

## A.    Causation

To "recover in a products liability action, the defective product must be the actual and proximate cause of the injury[.]"  *Wilcheck v. Doonan Truck & Equip., Inc.*, 552 P.2d 938, 942 (Kan. 1976).  "Kansas courts define proximate cause as that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act."  *Markham v. BTM Corp.*, No. 08-4032-SAC, 2011 WL 1231084, at *7 (D. Kan. Mar. 30, 2011) (citation and internal quotation marks omitted).  The parties here focus on intervening cause, and the court recounts their competing arguments on this subject, in the next few paragraphs.

Defendant argues that plaintiff has failed to present a triable issue of causation because an intervening cause—the wind guard repair—broke the chain of causation.  Doc. 64 at 12.  To support this argument, defendant argues this case resembles *Texas Metal Fabrication Co. v.*

14

*Northern Gas Products Corp.*, 404 F.2d 921, 922 (10th Cir. 1968). There, a heat exchanger

exploded at a plant, injuring plaintiff. *Id.* at 922. Plaintiff brought a product liability lawsuit

against the heat exchanger's manufacturer, and he prevailed at trial. *Id.* The manufacturer

appealed, arguing that a third-party installer had modified the manufacturer's heat exchanger to

stop a "rattle," and that modification was an intervening cause that broke the causal chain. *Id.* at

923. The manufacturer also argued that the modification caused the explosion and, as a result,

proximately caused plaintiff's injury. *Id.* Our Circuit agreed with the manufacturer's arguments.

The Circuit determined "the record show[ed] with little or no question that the alteration by [the

installer] caused . . . this accident." *Id.* at 925. And as the Circuit explained, the manufacturer

had "clearly shown" that the third-party installer's act qualified as an "intervening act" that broke

the causal chain. *Id.*

Plaintiff disagrees, arguing that *Texas Metal* doesn't apply here because the Tenth Circuit

didn't have to consider causation. Doc. 65 at 16. Indeed, the Circuit concluded in *Texas Metal*

that "the record show[ed] with little or no question that the alteration [by the installer] caused"

the heat exchanger explosion. 404 F.2d at 925. Not so here, plaintiff asserts. Plaintiff also

argues that the causation issues in this case more nearly resemble those in *Blim v. Newbury*

*Industries, Inc.*, 443 F.2d 1126 (10th Cir. 1971).

There, a plastic injector press closed on plaintiff's hand, and she sued the press's

manufacturer for negligence and defective manufacture. *Id.* at 1127. A jury found for plaintiff,

and the manufacturer appealed. *Id.* Plaintiff theorized that the manufacturer had failed to fasten

a bolt properly, and the loose bolt caused the press to malfunction. *Id.* The manufacturer

pointed out that plaintiff's employer had removed safety bars from the press because the safety

bars had malfunctioned, and the absence of safety bars qualified as an intervening cause of

plaintiff's injury. *Id.* at 1127–28. The Circuit determined that the lack of safety bars hadn't caused plaintiff's injury because "evidence demonstrated that they were already ineffective, [so] their removal could not even exacerbate the hazard." *Id.* at 1128. The Circuit explained that the employer's removal of the bars "could not, as a matter of law, constitute a superseding, intervening cause of the injury." *Id.* If only the court could decide this case by deciding whether this case more closely resembles *Texas Metal* or *Blim*. But it can't. It's just not that simple.

Neither *Texas Metal* nor *Blim* helps the court because neither is a summary judgment case. This summary judgment case turns on evidence and burden. Defendant argues it is entitled to summary judgment because plaintiff has failed to controvert its explanation for the bearing failure. Defendant has adduced evidence that plaintiff's wind guard repair caused the bearing to fail, which then caused the fire. Plaintiff has adduced evidence that a failed bearing caused the fire and thus argues that he's created a triable issue about the cause of the bearing's failure. So, setting aside *Texas Metal* and *Blim*, the court must evaluate the parties' evidence in this case's summary judgment record. Part B, following, undertakes that analysis.

### B.     Evidence of Causation

The elements of a product liability claim "may be proven inferentially, by either direct or circumstantial evidence." *Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 360 (Kan. 1983). Plaintiff here relies, in part, on circumstantial evidence. "For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective." *Id.* "Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility." *Id.*

Both parties have proffered expert testimony.  The "well-established test for determining whether expert testimony is required under Kansas law is whether the subject matter is too complex to fall within the common knowledge of the jury and is beyond the capability of a lay person to decide." *Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 667 (10th Cir. 2013) (citation and internal quotation marks omitted) (applying Kansas law).  The court must determine "whether the trier of fact would be able to understand, absent expert testimony, the nature of the standard of care required of defendant the alleged deviation from the standard." *Id.* (citation and internal quotation marks omitted).

Here, defendant, as the movant for summary judgment, bears "the initial burden of production[.]" *Kannady*, 590 F.3d at 1169 (citation and internal quotation marks omitted).  Defendant satisfied that initial burden by adducing expert testimony about the cause of the Baler's bearing failure.  That is, defendant's expert concluded that plaintiff's wind guard repair—an intervening cause—broke the chain of causation.  Defendant points out that plaintiff hasn't proffered any expert opinion challenging this opinion or offering a different explanation for the bearing failure.  So, defendant argues, plaintiff has failed to create a triable issue whether a product defect in the Baler caused the Baler fire.

Indeed, when defendant's expert proffered an opinion about the cause of the bearing's failure, the summary judgment burden shifted to plaintiff to "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* (citation and internal quotation marks omitted).  The governing law assigns the burden of proof on the causation element to plaintiff. *103 Invs. I, L.P.*, 470 F.3d at 989 (applying Kansas law).  To sustain this burden, plaintiff must proffer circumstantial evidence that "tend[s] to negate other reasonable causes, or [proffer] an expert opinion that the product was defective."

*Mays*, 661 P.2d at 360.  Thus, the court examines plaintiff's summary judgment evidence, starting with his properly disclosed expert testimony.

Plaintiff's first expert, Hamers, concludes in his report that the "fire was caused [by] heat produced from a failed bearing."  Doc. 64-1 at 99 (Hamers Report).  Hamers's report doesn't opine, however, about why the bearing failed.  *See generally id.* at 95–99 (Hamers Report).

Plaintiff's other expert, Scurto, concludes in his report that the evidence "indicates that the bearing at the outside end of the drive shaft failed which resulted in severe wear on the shaft to the point where it twisted apart."  *Id.* at 66 (Scurto Report).  Scurto's report also provides that "the cause of the fire has been determined to be the ignition of combustible materials by heat produced through friction from the metal on metal contact that occurred as the bearing failed."  *Id.*  Yet Scurto's report doesn't opine why the bearing failed.  *See generally id.* at 64–67 (Scurto Report).  Thus, plaintiff proffers no expert testimony explaining the cause of the bearing's failure.  But plaintiff believes this absence of expert testimony isn't a big deal.

That's because, plaintiff argues, his experts didn't acknowledge the wind guard repair in their reports because the wind guard repair "was not a relevant factor in the cause of the bearing failure."  Doc. 65 at 18.  This argument misunderstands plaintiff's summary judgment burden.  Defendant proffered evidence that explained the cause of the bearing failure—an intervening cause that defeats proximate cause—so the summary judgment burden shifted to plaintiff to identify evidence creating a genuine issue of causation for trial.  *Kannady*, 590 F.3d at 1169.

The court could grant summary judgment to defendant based solely on plaintiff's failure to provide expert testimony about the cause of the bearing's failure.  To be sure, some plaintiffs can rely on circumstantial evidence *or* expert testimony to prove causation.  *Mays*, 661 P.2d at 360.  But the innerworkings of the drive shaft bearing on the Baler at issue here are "too complex

to fall within the common knowledge of the jury and is beyond the capability of a lay person to decide." *Ho*, 520 F. App'x at 667 (citation and internal quotation marks omitted). Plaintiff's brief asserts that the wind guard repair didn't cause the bearing to fail—but that assertion in a brief isn't evidence. *State Farm Fire & Casualty Co. v. Telecomm Consultants, Inc.*, 757 F. App'x 726, 729 (10th Cir. 2018) ("Arguments by counsel in briefs are not evidence."). Plaintiff needed to adduce expert testimony about the cause of the bearing failure. To say it simply, he doesn't have any. *See Am. Mech. Sols., LLC v. Northland Process Piping, Inc.*, No. CIV 13-1062, 2016 WL 3135646, at *12–13 (D.N.M. May 24, 2016) (granting summary judgment in product liability case where defendant offered expert testimony about cause of hose failure and plaintiff did "not cite to the record or attach any evidence . . . to counter" defendant's expert report).

Without expert testimony, plaintiff invokes circumstantial evidence hoping to survive defendant's summary judgment motion. Plaintiff cites the following circumstantial evidence to support his argument that he has created a triable issue of causation:

- Plaintiff properly maintained the Baler.

- Witnesses who operated the Baler testified that the wind guard repair didn't cause performance problems or adversely affect the Baler.

- 10% of PEER bearings fail before the end of their lifespan.

The court considers each piece of evidence, in turn, below.

### 1.    Maintenance

Defendant's expert, Hawken, concluded that the Baler fire, "even if identified as a damaged bearing, was the direct result of improper repairs/modifications (including the welding of a steel fence post to the wind guard tube), improper maintenance, and a failure to follow recommended practices and instructions found within the Operator's and Service Manuals."

19

Doc. 64-1 at 23 (Hawken Report).  Plaintiff argues that he sufficiently has controverted one of those causes:  improper maintenance.

For example, plaintiff testified that he regularly fueled and greased the Baler, oiled the chains, blew off packed hay, put in rolls of net wrap, and changed the knives on the Baler's swathers.  Hamers's expert report mentions that the "failed bearing does require periodic lubrication which [plaintiff] indicated that he does on a routine basis."  Doc. 64-1 at 99 (Hamers Report).  Plaintiff also notes that the dealer, KanEquip, performed four warranty repairs on the Baler and never advised plaintiff that he had maintained the Baler improperly.  And plaintiff asserts that KanEquip knew about the wind guard repair, because Allenmand told them about it during KanEquip's last warranty repair.  Plaintiff thus argues that he "and his experts have effectively ruled out misuse and abuse of the Subject Baler as a potential cause to the bearing's failure."  Doc. 65 at 22.  But no reasonable jury could find that this evidence about maintenance refutes Hawken's opinion.

Hawken explained why, in his opinion, the wind guard repair caused the Baler's driveshaft bearing to fail:

> There is . . . evidence the wind guard tube and wind guard roller, both of which help transition and feed hay and material onto the baler pickup, was damaged prior to the fire.  Someone welded a steel fence post along a vast length of the tube, which interfered with the wind guard roller.
>
> . . . .
>
> This modification also has wider implications and consequences:  the sledge rollers showed signs of physical damage from ingestion of foreign objects (material other than hay) that caused the subsequent damage and deterioration to the PTO output shaft, bearing, and other damage to rollers, belts, and chains.
>
> There is physical post-fire evidence that this baler was not well maintained or serviced properly.  Recommendations are clearly explained in the Operator's Manual:  following and completing these recommendations and tasks are the sole and direct responsibility of the owner/operator.

20

Repairs made to / on this baler were not in accordance with proper service or maintenance recommendations found in the Operator's or Service Manuals.

Proper feeding of hay material onto the baler pickup is a necessity particularly since a non-functioning component can cause improper feeding and balling up of material before getting to the pickup, leading to improper bale formation and other problems.  The wind guard components are designed and installed to improve and help material feed properly for proper bale formation.  Using a steel fence post with sharp edges which interfere with and prevents the wind guard roller from turning is an improper and unauthorized repair.[5]

Authorized replacement parts were and are available to make proper repairs.  The tube repair / replacement should have been made using the correct parts, but that was not done.  Instead, a fence post was utilized.

 . . . .

There is only one avenue of material ingress into the baler, and it is past these [wind guard] components.  If an object is large enough to damage internal rollers and possibly even stall an operation baler while in use (while the PTO is engaged) it's likely to put stress on the PTO output shaft and all other driven components downstream which includes rotating shafts, rollers, bearings, idlers, sprockets, and chains.

Doc. 64-1 at 22–23 (Hawken Report).

At summary judgment, the court accepts as fact that plaintiff properly maintained the

Baler.  But evidence that plaintiff maintained the Baler properly doesn't even address the other

---

[5]     Plaintiff's response to defendant's Motion to Strike asserts that the wind guard tube sits outside the Baler's rolling elements.  Doc. 68 at 10.  That is, plaintiff welded the fence post to the wind guard in an area outside the internal workings of the Baler, so it caused no problems.  *Id.*  Plaintiff also accuses defendant of providing misleading photographs of the wind guard repair.  There are several reasons why the court cannot consider this material at summary judgment.

Plaintiff didn't raise the misleading photograph argument in his summary judgment briefing; he waited until his response to the Motion to Strike.  He thus has waived this argument.  *See United States v. Cooper*, 498 F.3d 1156, 1160 (10th Cir. 2007) (finding appellant's argument "waived" because he "does not raise these arguments in his brief"); *see also Fullen v. City of Salina, Kan.*, No. 21-4010-JAR-TJJ, 2021 WL 4476780, at *13 (D. Kan. Sept. 30, 2021) (declining to consider defendants' arguments because they "waived these arguments by failing to raise them in their opening brief").  And, even if timely presented, lawyers' arguments in briefs are not evidence.  *State Farm*, 757 F. App'x at 720 ("Arguments by counsel in briefs are not evidence.").  Plaintiff's response to the Motion to Strike also argues about the internal workings of the Baler—a complex topic that requires expert testimony.  *See Ho*, 520 F. App'x at 667.  In sum, all this argument is too little, too late.

pieces of Hawken's report:  the rollers, the improper feeding, the need for the wind guard roller to turn, or the stress on the PTO output shaft and, downstream, the bearings.  More bluntly, plaintiff's evidence about maintenance doesn't address whether the wind guard repair qualifies as an intervening cause that breaks the chain of proximate cause.  Plaintiff's maintenance wasn't a proximate cause of the Baler fire—point taken.  But that point doesn't nullify a far more important point:  the rest of Hawken's expert report sits unrefuted.  Plaintiff's proper maintenance of the Baler thus doesn't create a triable issue of fact.

> **2.    Witness Testimony About Baler Operation After Wind Guard Repair**

Plaintiff next asserts that he has created a triable issue of causation based on lay witness testimony he adduced.  Specifically, plaintiff argues that the wind guard repair didn't cause the Baler fire because those who operated the Baler didn't have any problems with the Baler after the wind guard repair.  But this lay witness testimony doesn't controvert Hawken's expert opinion that the wind guard repair caused the bearing to fail.  *Rodgers v. Beechcraft Corp.* illustrates this principle.  759 F. App'x at 679.

There, plaintiffs brought manufacturing and design defect claims against a plane's manufacturer.  *Id.*  They argued that a defect in the plane's electrical system caused the plane to crash.  *Id.*  To support their theory about the electrical system, plaintiffs proffered the testimony of two plane passengers who had seen the plane's display lights flicker.  *Id.*  Plaintiffs argued that this testimony created a material issue of fact whether the plane's electrical system had caused the plane to crash.  *Id.*  The district court disagreed, holding that the two passengers' "observations about a flickering power display were not enough to create a genuine dispute as to causation without any expert testimony."  *Id.* at 677.  The Circuit affirmed.  *Id.* at 679.  It explained that, because the two passengers were lay witnesses, their testimony didn't adequately

establish that an electric problem caused the plane crash.  *Id.*  The Circuit further explained that in "the context of a complicated aircraft electrical system, Plaintiffs needed expert testimony to prove causation."  *Id.* (citing *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011)).  Similarly, here, plaintiff needed expert testimony.

Instead, plaintiff proffered evidence from lay witnesses to show that the wind guard repair didn't cause the bearing failure.  Specifically, plaintiff cites his own testimony and Allenmand's testimony—*i.e.*, they didn't observe any performance problems after plaintiff welded a fence post to the Baler's wind guard.  But this lay witness testimony doesn't controvert Hawken's expert opinion that plaintiff's wind guard repair caused the bearing failure.  To opine about the complicated mechanics of the Baler and controvert Hawken's expert opinion about the repair's effect on the driveshaft bearing, plaintiff needed expert testimony.  Without it, Hawken's expert opinion is uncontroverted.  So, the lay witness testimony about the Baler's performance after the wind guard repair doesn't create a triable issue of fact.

### 3.    PEER Bearing Failure Rate

Plaintiff's third piece of circumstantial evidence concerns PEER bearing's failure rate. To show a triable issue of causation, plaintiff theorizes that "the bearing in question was manufactured by PEER and [plaintiff] has produced evidence that PEER advertises 10% of its bearings will not reach their designated life expectancy and may fail prematurely."  Doc. 65 at 22.  Plaintiff asserts that this evidence about PEER bearings, "in conjunction with the operators' observations regarding the performance of the Subject Baler after the wind guard fix, and the lack of any evidence of abuse or misuse of the machine, allowed [plaintiff's] experts to opine that the driveshaft bearing was defective."  *Id.*  This evidence about PEER bearings fails to create a genuine dispute of material fact.

23

First of all, and most of all, plaintiff's argument about PEER bearings fails because he adduced no evidence that the failed bearing was a PEER bearing.  In his summary judgment brief, plaintiff's Statement of Fact 44 asserts, "The manufacturer of the bearing in question, PEER, advertises that 10% of its bearings will not reach their life expectancy and may fail prematurely[.]"  *Id.* at 12.  To support this, plaintiff cites his Exhibit G, a PEER Agricultural Bearings Catalog.  *Id.*  Exhibit G is, simply, a parts catalog.  *See* Doc. 65-2 at 49–81.  Tellingly, neither of plaintiff's experts opined that the failed bearing was a PEER bearing.  And plaintiff failed to cite any evidence in the summary judgment record capable of supporting a rational finding (or inference) that the failed bearing was a PEER bearing.

Plaintiff didn't make this vital connection until his response brief to defendant's Motion to Strike.  Doc. 68.  There, plaintiff offers the following photo, with his own red circle:



*Id.* at 6.  Plaintiff didn't cite this photo in his summary judgment briefing.  And he didn't attach this photo as an exhibit.

To skirt this waiver issue, plaintiff asserts that Hamers included this photo in his report. The image below demonstrates how the photo appears in the summary judgment record, attached to Hamers's report:



Doc. 64-1 at 103 (Hamers Report).  To say the obvious, one cannot discern from this photo that the bearing portrayed in the image is a PEER bearing.  And, again, plaintiff didn't attach this photo, much less cite this photo, in his summary judgment response.

The court thus considers plaintiff's argument about the PEER bearings' failure rate waived.  *See United States v. Cooper*, 498 F.3d 1156, 1160 (10th Cir. 2007) (finding appellant's argument "waived" because he "does not raise these arguments in his brief"); *see also Fullen v. City of Salina, Kan.*, No. 21-4010-JAR-TJJ, 2021 WL 4476780, at *13 (D. Kan. Sept. 30, 2021) (declining to consider defendants' arguments because they "waived these arguments by failing to raise them in their opening brief").  The court understands that this photo is in the summary judgment record.  But where "a report or other material is made part of the record but the party

fails to cite to the particular parts of the record that support a particular argument, the district court is under no obligation to parse through the record to find the uncited materials." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1191 (10th Cir. 2020) (internal quotations marks, brackets, and citation omitted). The court need not search exhibits for evidence that might support plaintiff's claim without a specific reference. *See Chavez v. New Mexico*, 397 F.3d 826, 839 (10th Cir. 2005) (holding in summary judgment context that "[w]ithout a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence" which might support the plaintiff's case); *accord United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Even if the court considered plaintiff's evidence about PEER bearings' failure rate, it would not suffice to survive summary judgment. Plaintiff's evidence of the PEER bearing failure rate is a hypothetical cause unsupported by evidence. Recall *Rodgers*, where plaintiffs brought a product liability suit after a plane crash. 759 F. App'x at 649–50. Plaintiffs alleged a design defect in the plane's alternate landing gear based on the pull-force required to engage the alternate landing gear. *Id.* at 680  Plaintiffs cited evidence from two experts who tested the pull-force required for alternate landing gear in three other planes of the same model. *Id.* The Circuit affirmed the district court's grant of summary judgment against this theory because the experts' "testing did not address the plane that was involved in the crash, and there [was] no expert evidence on what precisely [was] the defect in the alternate landing gear." *Id.*

Similarly, here, plaintiff's PEER bearing failure rate evidence does "not address the [bearing] that was involved in the [fire] and there is no expert evidence on what precisely is the defect in the" bearing. *Id.* Thus, even if the court considered the PEER evidence that plaintiff

failed to cite in his summary judgment response, the evidence can't create a genuine triable issue of fact.

### C.      The Sum of the Evidence

In sum, plaintiff failed to proffer expert testimony to controvert defendant's expert's opinion that the wind guard repair caused the bearing to fail.  Defendant thus has presented unrefuted expert testimony supporting its argument that the wind guard repair was an intervening cause that broke the causal chain.  And, as part B explains, plaintiff's circumstantial evidence doesn't create a triable issue.

Without expert testimony, plaintiff relied on circumstantial evidence.  Plaintiff's "circumstantial evidence must merely negate other reasonable causes; it need not negate *all* reasonable causes[.]"  *Glenn v. Procter & Gamble Co.*, No. 06-4144-EFM, 2009 WL 10688943, at *8 n.60 (D. Kan. Sept. 10, 2009) (citing *Mays*, 661 P.2d at 360).  The problem for plaintiff here is this:  his circumstantial evidence failed to negate the cause identified by defendant's evidence.  His evidence about the Baler maintenance didn't address the wind guard repair.  His lay witness testimony didn't controvert Hawken's expert testimony.  He waived his argument on the PEER bearing failure rate.  And, even if he hadn't, the PEER evidence amounts to a mere hypothetical—not enough to create a triable issue that the PEER bearing in the Baler actually failed.

Plaintiff thus has failed to shoulder his summary judgment burden to show a triable issue of proximate cause and defendant thus deserves summary judgment.

### D.      Breach of Express Warranty

Defendant also moves for summary judgment against plaintiff's claim for breach of express warranty.  Plaintiff's express warranty theory goes like this:  "the failed bearing was

defective and the wind guard tube was not a factor in causing the bearing to fail," so "all damages caused as a result of the defective bearing are recoverable in accordance with the express warranty."  Doc. 65 at 22.

Defendant has several theories why plaintiff's breach of express warranty claim fails as a matter of law, but one stands out:  plaintiff failed to report the defect during the warranty period. The Express Warranty covers "a defect in material or workmanship . . . found in a unit and reported during the Warranty Period[.]"  Doc. 64-1 at 133 (Express Warranty).  Under the terms of the warranty, if a buyer reports a defect, then defendant "will pay parts and labor costs to repair the defect if the services are performed by an authorized . . . dealer[.]"  *Id.*  The Express Warranty expired on September 27, 2019.  Doc. 62 at 2–3 (Pretrial Order ¶ 2.a.ix.).  There's no dispute.  Plaintiff failed to report the bearing failure before September 27, 2019.

Trying to get around this problem, plaintiff argues that defendant's warranty process "is not designed to process a warrantable failure that involves a total fire loss."  Doc. 65 at 23. Plaintiff asserts that defendant delegates the warranty process to its dealers, but according to plaintiff, the dealer in this case—KanEquip—had no employee qualified to investigate warranty claims of total fire loss.  *Id.* at 24.  According to plaintiff, this deficient warranty system deprives him of the benefit of the bargain and, as a result, the Express Warranty "fails of its essential purpose."  *Id.* at 25.  Plaintiff also argues that the Express Warranty's timing requirement "creates impractical hurdles" because it requires a buyer to find *and* report the defect within the warranty period, but it's up to defendant to determine if an issue qualifies as a "defect."  *Id.* at 26.  And plaintiff asserts that the lack of notice didn't prejudice defendant.  None of these arguments surmount plaintiff's failure to report the defect within the warranty period.

The Express Warranty doesn't cover the bearing failure because the undisputed facts show that plaintiff didn't report the bearing failure by September 27, 2019. To be sure, whether a remedy has failed of its essential purpose generally is considered a question of fact. *Elite Prof'ls, Inc. v. Carrier Corp.*, 827 P.2d 1195, 1204–05 (Kan. Ct. App. 1992). But to determine whether "a limited warranty fails in its essential purpose is determined by whether a buyer is given, within a reasonable time, goods that conform to the contract." *Ritchie Sands, Inc. v. Eagle Iron Works*, No, 87-1385-C, 1989 WL 31408, at *5 (D. Kan. Mar. 14, 1989) (citation omitted). Because plaintiff never reported the defect during the warranty period, defendant never had a chance to fulfill its end of the contract. Defendant didn't find out about the Baler fire until January 2020, when it received a litigation notice—that didn't mention the Express Warranty. No reasonable factfinder could find that defendant breached the Express Warranty because no reasonable factfinder could blame defendant for failing to pay for the bearing failure. Plaintiff didn't comply with the Express Warranty's provisions. So, plaintiff's arguments about defendant's warranty process and its essential purpose are merely hypothetical.

Nor is the court persuaded by plaintiff's argument about the Express Warranty's "impractical hurdles." Plaintiff has adduced no evidence that "impractical hurdles" caused his failure to report the bearing's alleged defect. Plaintiff reported the Baler fire to his insurer the next day. He just didn't report it to defendant. And the litigation notice that plaintiff sent defendant in January 2020 didn't request a remedy under the Express Warranty.

The court thus holds as a matter of law that defendant deserves summary judgment against plaintiff's claim for breach of the Express Warranty.

## V.     Conclusion

As explained in this Memorandum and Order, the court grants defendant's Motion to Strike (Doc. 66) and grants defendant's Motion for Summary Judgment (Doc. 63).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's "Motion to Strike Paragraph 6 of Affidavit of Steven Hamers" (Doc. 66) is granted.

**IT IS FURTHER ORDERED** that defendant's Motion for Summary Judgment (Doc. 63) is granted.

**IT IS SO ORDERED.**

**Dated this 28th day of September, 2023, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**